COMMONWEALTH TRUST CO., a Delaware Corporation, Trustee (as the result of a merger with Hamilton Trust Company) under trust agreement dated October 1, 1936, between Capital Retirement Plan, Inc., a New York corporation, and Hamilton Trust Company, a Delaware corporation,

*vs.*

CAPITAL RETIREMENT PLAN, INC., and UNDERWRITERS GROUP, INC., both New York corporations, JOSEPH COHEN, FREDERICK B. HAWKINS, FRANCES C. NEALE, HANNA COHEN, ANNA CURRAN, JOSEPH ROBINSON, CHARLES R. WALKER, GEORGE HECKEL, LENA M. EAGON, and All Registered Certificate Holders of Trust "UG-B" named in Exhibit "B" to this Bill of Complaint who may elect to appear in this cause,

Defendants,

SOL HENDLER,
Intervening Defendant.

*New Castle, September 15, 1947.*

*James R. Morford,* of the firm of Marvel & Morford, for complainant.

*Stewart Lynch* and *Daniel L. Herrmann,* of the firm of Lynch & Herrmann, (Finke, Jacobs & Hirsch, of New York City, of counsel) for Frederick B. Hawkins and Anna Curran, certain of the defendant assignees.

*Robert C. Barab,* for Sol Hendler, intervening defendant, one of the certificate holders.

SEITZ, Vice-Chancellor: The principal point for decision involves the right of the assignees of the trustor of a business trust to receive certain payments payable to the trustor or its assignees under the terms of the trust indenture.

Capital Retirement Plan, Inc., a New York corporation, as trustor, entered into a trust indenture with Hamilton Trust Company, a Delaware corporation, as trustee, dated October 1, 1936, and known as trust UG-B. The trust was a variation of the "Massachusetts" or "business" trust in that the principal functions were to be performed

by the trustor rather than the trustee. Subsequently, by virtue of a merger, the complainant Commonwealth Trust Company replaced Hamilton Trust Company as trustee. The trust was to last for twenty years (until September 30, 1956) unless sooner terminated.

The trust indenture is both prolix and abstruse. In order to understand and resolve the problems presented to the court, it becomes necessary to summarize some and quote other paragraphs of the indenture.

Generally, the plan called for the trustor to deposit oil royalty interests and other properties owned or controlled by it with the trustee who was to issue trust certificates to the trustor, or its nominees, in amounts and in the manner prescribed in the trust indenture.

More specifically, the trustor could deposit with the trustee interests in oil royalty deeds, oil royalty leases, overriding royalties, oil payments, gas royalty deeds, gas royalty leases, overriding gas royalties, gas payments, mineral royalty deeds, oil and gas leases, oil and gas working interests, and other similar or related interests in oil and gas properties. The trustor could deposit such properties in the trust until the "billing price" (as defined in the indenture) reached $1,000,000. Trust certificates were to be divided into units, and the total number of units which could be issued against an aggregate billing cost of $1,000,000. was 10,000 units, with the right to issue one unit for each $100 multiple of the billing price.

The method of calculating the value at which the trust certificates were to be issued to the trustor or its nominees is set forth in paragraph 8 of the indenture.

"8. The method of determining the unit amount of Trust Certificates to be issued by the Trustee against the oil royalty interests and other property deposited by the Trustor, under the terms of this Agreement, shall be as follows:

"(a) The Trustor, at the time of making a deposit, shall certify in writing to the Trustee the billing price, hereinafter defined, of the

properties included in such deposit, and shall furnish and deliver to the Trustee concurrently therewith, all necessary documentary evidence of ownership and such other documents as may be necessary to effectuate the transfer of the deposited interest and/or properties to the Trustee for the Trust Estate, whereupon the Trustee shall issue Trust Certificates to the extent of one unit for each One Hundred Dollar ($100.00) multiple of the billing price, as hereinafter defined, of the properties so deposited, and the Trustee shall issue in the name of and deliver the said Trust Certificates to the Trustor and/or its nominee or nominees.

"(b) The billing price, herein referred to, of properties, shall represent an amount equivalent to 10/6ths of the aggregate of the following component elements of cost, which aggregate of component elements of cost is herein referred to as 'inclusive cost price.'

"This inclusive cost price shall represent:

"(a) 'Property cost', which shall comprise the combined aggregate of the actual amount paid by or in behalf of the Trustor for the said oil royalty interests and/or other properties, together with all expenses and expenditures incidental thereto paid or incurred on account of the purchase of said royalty interest and/or other properties, including technical fees; legal fees; traveling expenses; recording fees; expenses in preparing transfer and division orders to Pipe Line companies for payment of oil and gas runs to Trustee or its nominees; fees and expenses of depositing oil royalty interests and/or other properties with the Trustee, together with all such items necessary to be paid or incurred for the proper effectuation of the transfer to the Trustee of the properties purchased for the account of the Trust under this paragraph.

"(b) An amount equivalent to one month's estimated runs of oil and/or gas from the deposited properties, a bank check of the Trustor, covering which is simultaneously to be deposited with the Trustee for credit to the Income Account of the Trust as hereinafter defined."

The trust indenture was somewhat unusual, but not unique, in that control over the trust portfolio was reserved in the trustor. Thus, paragraph 3 provides in part that:

"3. The Trustor shall have the exclusive right, from time to time, and, at any time, to substitute the properties hereunder deposited, in its sole discretion and judgment and to sell, transfer and exchange and otherwise convey said properties included in the Trust Estate herein, and to replace, substitute and/or purchase for the same, other properties which the Trustor believes to be beneficial and for the best interests of the certificate holders, * * *."

The indenture assigns many other functions to the trustor, such as the right to decrease the payments to the certificate holders, the right to supervise the sinking fund and to pass on loans therefrom, and the right to redeem certificates. By contrast, the functions of the trustee under the terms of the indenture are hardly more than those of a fiscal agent who keeps a certificate register, and who collects and distributes income in accordance with the provisions of a trust indenture. Incidentally, it is not suggested that the trust is illegal because all the substantial functions are assigned to the trustor rather than the trustee.

The trust indenture sets up what is denominated as a "Special Account" for the benefit of the trustor. It is around this paragraph (126) that the principal dispute revolves. It provides:

"126. As of each calendar month, until the final liquidation of the Trust Estate, the Trustee shall charge against the Income Account and shall credit to a Special Account a sum equal to One-sixth of One Percent (1/6 of 1%) of the value, determined as in Paragraph 127 provided, of the Trust Estate. After such credit, the amount so credited shall not be deemed part of the Trust Estate and the amounts credited to this Special Account shall be disbursed to the order of the Trustor hereunder. The amounts received by the Trustor therefrom shall be lieu of any other compensation to the Trustor for its services hereunder, except as otherwise expressly provided herein. The right to receive the proceeds of the Special Account provided for in this paragraph shall be assignable by the original Trustor hereunder and the assignee thereof shall acquire this right and continue so to exercise it irrespective of the fact that such assignee is not or may be a successor Trustor hereunder."

The method for determining the value mentioned in paragraph 126 is set forth in paragraph 127:

"127. The method for determining the value of the Trust Estate for the purposes provided for in Paragraph 126 hereof shall be as follows:

"(a) The certified total billing price as defined in Paragraph 8 of this Agreement of all property interests deposited in the original portfolio hereunder, then held by the Trustee as part of the Trust Estate;

"(b)  To which shall be added all accumulations in the hands of the  Trustee  in the  Income  Account  prior  to  any  current  monthly charges to be made against such Income Account;

"(c)  To which there shall be further added the value of the Sinking Fund, which value shall be considered to be the aggregate of the certified billing cost of all properties therein deposited plus the amount or value of any cash funds and/or securities on deposit to the credit of the Sinking Fund;

"(d)  The result of the above computations shall be deemed the value of the Trust Estate for the purpose of arriving at the credit of the Special Account provided for in Paragraph 126 hereof."

Paragraph 59 of the indenture provides for a special commission to be paid the trustor for its "continuing services in the management of the Sinking Fund and in the purchase of additional properties from time to time as provided herein."

Certificates having a face value of about $287,900 are presently outstanding, and are held by approximately 80 individuals or corporations.

No property has been deposited with the trustee by the trustor since about 1939, and no sinking fund ever existed.  In fact, the trustor apparently performed very few functions in connection with the trust after depositing certain properties in the original portfolio.

In 1938 the trustor made an assignment to the defendant Frederick B. Hawkins of a portion of its rights under paragraph 126, and payments thereunder were made by the trustee to the assignee Hawkins until about January 1, 1945.

In 1944 the trustor made an assignment to the defendant Anna Curran of another portion of its rights under paragraph 126, and payments were also made by the trustee to the assignee Curran until about January 1, 1945. Assignments of other portions were made, but those assignees did not choose to appear, and a decree *pro confesso* was taken against them.

About January 1, 1945, the trustee stopped payments to the assignees for the stated reasons that the trustor had ceased to function, and had committed defalcations in connection with other similar trusts for which the trustee here is also trustee. The trustee credited to other separate trusts the money it has withheld from the answering assignees, on the theory that the payments under paragraph 126 belong to the trustor's *alter ego* Joseph Cohen and can, therefore, be used to reimburse the other trusts from which Joseph Cohen embezzled money. The propriety of this action by the trustee is one of the matters involved in the trustee's request for instructions.

It is conceded by all parties before the court that the trustor, Capital Retirement Plan, Inc., while a corporation, was but the *alter ego* of one Joseph Cohen, who in 1944 or 1945 was sentenced to a term in prison which will not expire for several more years. The proof demonstrates that the trustor has not functioned for several years past, and since the defendant Joseph Cohen is now and will be in prison for some time, and since he was (through yet another corporation) the sole stockholder of the trustor corporation, it seems reasonably certain that the trust will continue without the services of its original trustor. In fact, a decree *pro confesso* has been taken against the trustor, as well as against Joseph Cohen.

The principal point for decision involves the right of the answering assignees to receive the assigned amounts of the payments provided for by paragraph 126 of the indenture. The answering assignees claim they are entitled to continue to receive such payments for the reason that they hold valid assignments from the trustor. They contend that the payments are in return for services rendered by the trustor at the inception of the trust, and, therefore, the subsequent inactivity of the trustor in no way affects their rights to the payments. Conversely, the certificate holder takes the position that the trust indenture demonstrates quite clearly that the payments to be made under

paragraph 126 were to be in return for continuing services by the trustor, which services have not been forthcoming. The proper construction will determine whether or not the assignees are in a position to require payment of the money withheld by the trustee since January 1, 1945.

Preliminarily, the parties assume, as I shall do, that Delaware law controls the construction of this indenture, and, it is further assumed that the instrument is valid.

Returning to the principal problem, under the present circumstances, would the trustor, and therefore the assignees, be entitled to receive the payments provided for in paragraph 126 of the trust indenture? It is, of course, recognized by both the assignees and the certificate holder that the rights of the assignees here rise no higher than those of their assignor, the trustor.

It is conceded that the assignments are valid (with a reservation not here important), and the sole question would, therefore, appear to be whether the consideration required of the trustor in return for the payments provided for in paragraph 126 was supplied in full at the inception of the trust, or whether the trust contemplated continuing services by the trustor in return for this compensation.

An examination of the trust indenture reveals that the trustor was called upon to perform several functions other than those in connection with the sinking fund, not the least of which was its right to supervise the assets in the trust and to sell, replace and otherwise deal with them so as to give the trust the best possible income producing assets.

We may note that the trustor could profit under the indenture in three ways. (1) If it sold the trust certificates at any figure over about 40% of their participating value, it would receive a profit. This is so because the method of calculating the participating value of the certificates provided for by paragraph 8 required the trustor

to put up only about 40% of such value in order to procure the certificates. (2) The trustor received a monthly commission under paragraph 126 which was to be "in lieu of any other compensation to the Trustor for its services hereunder, except as otherwise expressly provided herein." (3) The trustor received a percentage "buying charge" to compensate it "for its continuing services in the management of the Sinking Fund and in the purchase of additional properties from time to time as provided herein."

While we are only concerned with the payments provided for under paragraph 126 of the indenture, nevertheless, it is necessary to consider the other paragraphs of the indenture in order to resolve the critical problem here posed.

Paragraph 126 gives the trustor a percentage of the income monthly "in lieu of any other compensation to the Trustor for its services hereunder, except as otherwise expressly provided herein." I have already indicated that under the indenture various functions are assigned to the trustor. Obviously, if the payments provided for in paragraph 126 do not compensate the trustor for these functions—and the assignees so contend—then they were apparently to be rendered by the trustor without compensation (a most dubious possibility here), unless we can say that the trustor was to be paid for such services by way of profit from the sale of certificates or from commissions on purchases made under the sinking fund provisions.

The stock certificates were calculated at $100 per unit, although the actual value of the assets turned over by the trustor in return for such certificates was very much less than the unit value of the certificates. Of course, the profit came only when the trustor sold the certificates for more than their corresponding value in assets supplied by the trustor, but the important thing is that the agreement apparently contemplated that the original services rendered by the trustor were to be compensated for from these

profits, and not from the payments provided for in paragraph 126. This conclusion may be drawn apart from any question as to the reasonableness of the formula used in calculating the unit value of the certificates. Moreover, the trustor certainly lost nothing by turning its assets over to the trustee, since all the certificates representing control over such assets were delivered to the trustor or its nominees.

Were the provisions dealing with the sinking fund intended to provide compensation to the trustor for its services under the indenture? Under the subhead "Operation of Sinking Fund" paragraph 59 of the indenture provides a commission to the trustor for "continuing services in the management of the Sinking Fund and in the purchase of additional properties from time to time as provided herein." This paragraph refers only to the trustor's services in connection with the sinking fund, and does not deal with the other functions of the trustor, particularly its function under paragraph 3 in connection with the sale, transfer, exchange and substitution of properties included in the trust estate. The solicitors for the assignees urge that the language in paragraph 59 reciting that the consideration thereunder was in part for services by the trustor "in the purchase of additional properties from time to time as provided herein" has reference to purchases generally, and is not limited to purchases for the sinking fund. They argue, therefore, that the principal function of the trustor in administering the trust, to wit, the purchase of properties, was to be compensated for under paragraph 59. Consequently, they say, the compensation provided for under paragraph 126 was not for continuing services to be rendered by the trustor, but for services originally rendered, since the continuing services were to be paid for under paragraph 59.

The difficulty with the argument of the solicitors for the assignees is that the language of paragraph 59 is under a subhead dealing only with the sinking fund, and, more-

over, the language of the paragraph itself is consistent when the language in question is limited to the trustor's function in connection with the sinking fund. Also, when the language of paragraph 59 relied upon by the assignee is sought to be applied to the trustor's function under paragraph 3 to sell, transfer, exchange and substitute properties in the trust estate itself, it is found to cover only a part of this function because it refers only to purchases. Clearly, therefore, the language relied upon from paragraph 59 is not broad enough to cover all the functions of the trustor even under paragraph 3. It seems fair to infer that the language of paragraph 59 was not intended to provide compensation to the trustor for functioning under paragraph 3 of the indenture, even aside from the trustor's other functions.

I conclude that neither the profits from the sale of certificates, nor the commission on purchases under the sinking fund provisions was intended to compensate the trustor for its continuing services under the indenture. Consequently, I conclude that the language of paragraph 126, when considered with the rest of the indenture, indicates that the payments provided for in paragraph 126 were to constitute compensation for the continuing services of the trustor.

Other considerations support my conclusion. Thus, the special account set up in paragraph 126 is calculated on a "value" consisting of the aggregate of the "billing cost" (representing about 40% actual assets and 60% air), all accumulations of income prior to charges against it, plus the value of the sinking fund (also inflated by use of the "billing cost"). When these value factors are considered, it is fair to say that any doubt as to the proper construction of paragraph 126 of the indenture should be resolved in favor of a construction thereof which requires continuous services by the trustor in consideration for these payments. Thus, the sum to be paid the trustor each month from the income account is based on such a large percentage of non-existent

or dissipating values that it is apparent that the trust was created very largely for the trustor's benefit. Any construction of the indenture which would tend to make the benefits more nearly follow the burdens is not unwarranted here. Moreover, the payments were to be made from income and it is not unreasonable to conclude that continuous supervision of the trust assets was expected in order to keep the income as high as possible with resultant benefit to the trustor as well as to the certificate holders.

The last sentence of paragraph 126 provides that "The right to receive the proceeds of the Special Account provided for in this paragraph shall be assignable by the original Trustor hereunder and the assignee thereof shall acquire this right and continue so to exercise it irrespective of the fact that such assignee is not or may not be a successor Trustor hereunder." It might be thought that this sentence authorizes the continuance of the payments under this paragraph without regard to the rendition of services by the trustor, but an examination of the whole instrument shows that the sentence was apparently inserted to avoid any conflict with paragraph 93, which paragraph only permitted the assignment of the trustor's rights and obligations under certain prescribed conditions. It is clear that the last sentence of paragraph 126 was merely inserted to permit an assignment of the payments by the trustor without more. However, it by no means indicates that the right to receive the money existed without regard to the performance of the trustor's functions as set forth in the trust indenture.

It is difficult to believe that the right to receive these payments had no relation to continuing services on the part of the trustor. Thus, if the trustor resigned, would it not seem odd that it should, nevertheless, continue to receive the payments under paragraph 126. Presumably a successor trustor could not be paid, except for services in connection with the sinking fund. Since the sinking fund feature of the plan was less important than the primary trust

itself, it is obvious that no really competent successor trustor could be procured to render the important services in connection with the trust portfolio without compensation. Yet, the contention of the assignees, if accepted, would result in a construction of the trust indenture, which would warrant payment only for services of a successor trustor in connection with the operation of the sinking fund.

I conclude that the payments provided for in paragraph 126 were in consideration of the continued supervision of the trust assets by the trustor, and not on account of its original efforts. When the trustor put itself in the position where it was no longer able to render the very vital services contemplated by the trust, there was a failure of consideration on its part which relieved the trustee from the duty to make further payments. Since it is conceded that as to this phase of the problem the assignees of the settlor stand in no better position than the assignor itself, it follows that the failure of consideration defense is equally available against the assignees, with the consequence that they are not entitled to receive the payments contemplated by paragraph 126. This conclusion is equally applicable to all such assignees. The fact that payments were made by the trustee to the trustor's assignees subsequent to the time when the trustor ceased to function, is not, as the assignees seem to contend, of real importance in resolving the problem of construction here involved. The solicitor for the certificate holder does not ask any relief with respect to such payments.

Under the facts and in view of the decree *pro confesso,* I conclude that the original trustor, Capital Retirement Plan, Inc., is unable to serve as trustor. In such a situation, paragraph 94 of the indenture provides that the trustee may appoint a successor trustor. The trustee has requested instructions as to the appointment of such a successor and has suggested that it be authorized to appoint itself successor trustor, or in the alternative, that the court appoint it or some other entity as successor trustor. The solicitor

for the intervening certificate holder contends that if a successor trustor is to be appointed, it should be made to demonstrate its capacity to perform the function of the trustor under this indenture, and should only receive the commission provided in paragraph 59 of the indenture. The assignees suggest that no successor trustor should be appointed.

While normally it would be desirable to have a successor trustor because of the vital function allocated to him under the trust, nevertheless, I believe the provisions of this indenture are so weighted against the certificate holders that no general successor trustor should be authorized by the court. However, because of the nature of the assets of the trust (wasting), it would seem desirable to appoint the trustee to act also as trustor for the limited purpose provided in paragraph 3 in order that existing trust assets may be sold, exchanged, etc., should the need arise. The record indicates that the trustee should be capable of performing this function. For this limited service as trustor, the trustee should be compensated, and the parties may be heard as to whether the commission provided in paragraph 59 of the indenture or some other percentage would constitute fair compensation.

We next consider the propriety of the trustee's using money, which it assumed was due the trustor under paragraph 126, to reimburse other trusts of which it is also trustee, and from which Joseph Cohen, the trustor's *alter ego,* embezzled money. Since all the money withheld by the trustee was payable subsequent to the time when I find the trustor ceased to perform the services for which this money was to constitute payment, it necessarily follows that such money was never due the trustor, and consequently, may not be used to reimburse the other trusts for defalcations by this trustor, or its *alter ego,* Joseph Cohen. The certificate holders of this trust are in nowise responsible for the defalcations of this trustor or its *alter ego* in connection with other entirely separate trusts. Conse-

quently, the money in question must be restored by the trustee to trust UG-B to be distributed in accordance with the terms of the indenture as here construed.

A decree accordingly will be advised.